**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JUAN LORENZO SOTO,                              No. C-13-5931 EMC (pr)

                    Petitioner,
                                                **ORDER DENYING PETITION FOR**
        v.                                      **WRIT OF HABEAS CORPUS**

R.T.C. GROUNDS, Warden,

                    Respondent.
_____/

## I.    INTRODUCTION

Juan Lorenzo Soto filed this *pro se* action seeking a writ of habeas corpus under 28 U.S.C. § 2254.  In his petition, Mr. Soto contends that his federal constitutional rights were violated by the trial court's admission of evidence about statements his co-perpetrator had made to a girlfriend.  The petition will be **DENIED**.

## II.    BACKGROUND

A.    The Crimes

The California Court of Appeal described the events that led to Mr. Soto's conviction for murder and other crimes.

> On the morning of July 25, 2004, defendants Juan Lorenzo Soto and Francisco Javier Valenciano, Jr., along with Anthony Gonzales, drove from Watsonville to Santa Cruz to commit a robbery.  They were armed with a shotgun and a pistol.  The liquor store they intended to rob was too busy, so the three men decided to rob a group of men they had seen playing cards in a nearby driveway, with a pile of money on the ground.  When Gonzales, armed with the shotgun, and Soto, armed with the pistol, approached the card players and directed them to hand over their money, all but one of them, Rodolfo Escobar, complied. Escobar instead insulted Gonzales, and picked up the money off the ground.  As one of his friends implored him to cooperate with the

gunmen, Escobar said he had to work hard for his money to support his family, and that if Gonzales wanted his money, he should ask [his] mama for [it]. Gonzales pressed the shotgun against Escobars forehead and pulled the trigger, blowing off the top of his head. Gonzales and Soto collected the money off the ground, went back to the car, where Valenciano had been acting as a lookout, and drove off.

*People v. Soto*, 2012 WL 2393081, *1 (Cal. Ct. App. June 26, 2012) (alterations in original).

The police officers who responded to the scene spoke to several men present who described the events of the robbery and shooting. Some of the men gave general descriptions of the men who had robbed them. While the police were talking to the victims, another man approached one of the officers and "described seeing a green Honda, containing four males, leave the scene just after the shooting. The man had written down the Honda's license plate number, so [officer] Vasquez broadcast the description of the car and the license plate number." *Id.* at *2. Several of the percipient witnesses to the shooting and robbery were unable to identify the perpetrators, but some later were able to do so at least tentatively.[1]

The California Court of Appeal also summarized evidence developed after the investigation at the scene of the crime, including the testimony of Vanessa Martinez.

7. Vanessa Martinez

Martinez met Gonzales when she was 18, at the house of Francisco "Frankie" Valenciano. After Gonzales was incarcerated for violating his parole, Martinez developed a relationship with him through letters, phone calls and prison visits. When he was released in March 2002, they lived together at his grandparents' house and in January 2003, she gave birth to Gonzales' child. In mid-July 2004, Martinez bought her own home in Watsonville and Gonzales moved in with her.

During this time, Martinez learned that Gonzales was a gang member. She saw his tattoos, including "VGV" (for Varrio Green Valley) on his stomach and "Norteno" across his lower back, and asked him about

---

[1] Jose Saul Ayala Baires was shown two photo lineups by police on July 28, 2004. "In one lineup, he identified a photo of Soto, writing on the card 'It seems to be him but I would have to see his body.' He was unable to identify anyone during a subsequent live lineup." *Soto*, at *4. "Francisco [Ayala] was shown several photo lineups, and in one of them, he identified a picture of Gonzales as 'someone who looked like the person with the shotgun.' At a live lineup, he identified Gonzales and another man as being similar to the man with the shotgun." *Id.* Another witness, G.G., who had seen the incident from her bedroom after hearing what sounded "'like a big bang,'" viewed two photo lineups on July 27, 2004, and picked out Gonzales from the first photo lineup, but then declined to participate in an in-person lineup the following week. *Id.* at *5-*6.

2

**United States District Court**
For the Northern District of California

them.  Gonzales also cut his hair in a fade hairstyle called a Mongolian.  He also owned a lot of Oakland Raiders clothing.

From April to December 2003, Gonzales was incarcerated at the Santa Cruz county jail for possession of marijuana for sale.  Valenciano gave Martinez $25 a month to put on Gonzales' book to buy items at the commissary, money to give to Andrea Gonzalez, who had a son with a VGV gang member; and $1,500 to give to Gonzales' mother for an attorney.  He also gave Martinez Christmas cards containing money to mail.  While in county jail, Gonzales obtained more tattoos, including "14," which stands for the Northern gang, on his chest, and stars on his left shoulder.

As a gang member, Gonzales was obligated to pay monthly "taxes" or dues to the gang.  Oscar Cabrera, a member of a Norteno gang and the Nuestra Familia prison gang, would beat up members who failed to pay their taxes.  Martinez witnessed Cabrera beating up a VGV gang member, Armando Cardenas, for such a failure.

Martinez had known Valenciano for about two years, and first met Soto about a week or two before July 25, 2004.  She believed both men were also gang members.

The week before the shooting, Martinez twice heard Valenciano tell Gonzales he needed money.  Valenciano said that if Maria Zamora did not lend him money, he was going to rob somebody.  Valenciano needed the money because his car was impounded and he had to pay $200 in tax to Cabrera, which he and Gonzales paid monthly.  Gonzales also needed money.  She knew that if Valenciano and Gonzales did not pay, they would be beaten up.

On July 24, 2004, at around 6:00 or 7:00 p.m., Charal Hernandez came to Martinez's house to have her hair and make-up done for a party.  Valenciano, Soto and Julio Cabrera, Oscar Cabrera's brother, were there, too.  Gonzales asked Martinez to leave them and go upstairs.  Soto, who was dating Hernandez, asked to borrow her car, a 1999 green Honda Accord EX.  Hernandez agreed, and Soto drove her to the party down the street.  At 9:00 p.m., Soto, Valenciano and Gonzales left in Hernandez's car, while Julio walked down the street to the party.

Soto, Valenciano and Gonzales returned sometime after midnight.  Valenciano left, but Soto stayed overnight, as did Hernandez.

The next morning, Sunday, July 25, Soto asked Hernandez if he could borrow her car again.  Hernandez refused at first, and asked why.  She offered to drive him where he wanted to go, but he took the keys from her and knocked on the door to Gonzales' bedroom.

It was about 7:00 or 8:00 a.m. when Soto knocked on the door, but Gonzales did not answer.  Soto knocked again, and Gonzales kissed Martinez and told her he would be right back.

Some time later, Martinez was driving with her son, her younger sister and Hernandez to get breakfast.  Gonzales called her cell phone, and

United States District Court

For the Northern District of California

said that Soto needed to talk to Hernandez.  Martinez gave the phone to Hernandez, and Soto told her she needed to report that her car had been stolen.  She asked what happened, but Soto did not explain.  He was upset and said to just report that it was "fuckin' stolen." Hernandez was crying, as the car was registered to her grandparents and she did not know how to explain to them about their car.  She refused to call 911.

Martinez warned Hernandez they would be in trouble if they did not do as they were told.  She was worried that the call might have something to do with the robbery that Gonzales and Valenciano discussed a few days prior, and was also worried that any blame would fall on Gonzales because he was on parole and was not supposed to be around other gang members, such as Soto and Valenciano.  Hernandez agreed to call the police and report the car stolen, so she and Martinez fabricated a story about how the car was stolen from in front of Martinez's house the night before.

Martinez then noticed she had missed a call from Gonzales and called him back, telling him she and Hernandez had filed a police report. While talking to her, Gonzales seemed distracted, and yelled at Soto, "[W]here's [Valenciano]?" She could hear people talking in the background and Gonzales said, "Excuse, excuse me, where's [Valenciano]? Where the fuck is [Valenciano]?" Martinez heard either Gonzales or Soto say, "There he is at the payphone." Gonzales said that they were in Santa Cruz and asked her to pick him up.  Martinez initially said no, but called back 20 minutes later to ask if he still needed a ride.  Gonzales said he did not.

Julio called Martinez later in the afternoon and told her to come by his house with her son.  When she arrived she saw Soto, Valenciano, Gonzales, Julio and Oscar sitting in a truck outside.  Gonzales told Martinez he was going to Mexico.  He was emotional and told her he was sorry.  Soto told Martinez to tell Hernandez he was sorry.

The next day, however, Martinez saw Gonzales at his grandmother's house.  He had a bad case of poison oak.  She asked him what had happened but he could not really speak.  She drove him back to their home, and about a week later, he was arrested.  During that week, Gonzales told Martinez what had happened on July 25, 2004.

Gonzales told Martinez he and Soto went to rob a liquor store in Santa Cruz, with Valenciano driving.  Because the store they had selected was crowded, they drove around the block.  As they did, they saw some men playing poker in a driveway, with money lying on the ground.  They pulled over and robbed the guys, with Valenciano staying by the car as he and Soto confronted the men.  Gonzales said one of the men was killed after trying to take back his money and talking back to the shooter.  Gonzales denied killing the man even though Martinez asked him many times.  When describing how the man was shot, Gonzales said Soto "ate brains."

They fled after the shooting, and Gonzales might have been driving at that point.  They had a police scanner and heard that the police were looking for the Honda so they left the car by a creek or river and threw

the weapons in the bushes.  Gonzales said they were in Santa Cruz when Soto called Hernandez and told her to report the car had been stolen.

Also during the week before his arrest, Martinez saw Gonzales dividing up about $150 in cash.  As he did so, Gonzales said to himself, "One for Soto," "one for Valenciano," and "one for me." Gonzales seemed angry with Valenciano and felt the "whole thing" was his fault.  Gonzales said the money was going to Julio and Oscar Cabrera.

Before his arrest, Gonzales told Martinez and Hernandez not to talk to the police.  After Gonzales and Soto were arrested, Valenciano waved Martinez over as she was driving one day.  He told her not to talk to the police and that there was no evidence.  He said if she needed to talk to him, she should do so in person, so there would be no phone records.

When Martinez was interviewed by Detective Christine Bentley, she did not tell the truth because she was afraid of Oscar Cabrera, who had threatened both her and Hernandez.  Martinez believed Oscar would kill her if she cooperated with the police.  On July 31, 2004, Oscar had gone to her parents' house looking for her, but she was not there.  She arranged to meet Oscar at Valenciano's parents' house later that day. When she arrived, she saw Valenciano's father was bleeding from a wound on his head.  Oscar had asked Valenciano's father for money to post bail, and when he refused, Oscar slashed his head open.  Martinez met with Oscar later and he reminded her that people who talk to the police end up dead.

Martinez lied about a number of things over the course of several interviews with Bentley, including that Gonzales was working on his car at his grandmother's house on the morning of the murder.  After being arrested and threatened with prosecution, Martinez told Bentley essentially the same story that she testified to at the trial.  She did not recall, however, asking Bentley to fabricate evidence against Soto. After the first time she testified in the case, she moved out of the area and changed her name.

8.  Alberto Anguiano and Maria Zamora

Alberto Anguiano worked with Valenciano and Gonzales in Watsonville for a couple of months at Sambrailo Packaging.  They became friends and Anguiano cut their hair weekly.  He knew that Valenciano was a gang member because he had a tattoo that read "Norteno" on the back of his head.  Anguiano knew that Gonzales was also a gang member because he had a tattoo of the "Northern star" on his left arm, and had a fade haircut with a "Mongolian" ponytail.

On July 25, 2004, at 10:20 a.m., Anguiano called Gonzales, who answered, but seemed hurried.  Gonzales passed the phone to Valenciano who asked Anguiano for Maria Zamora's phone number. Valenciano was interested in Zamora, who also worked at Sambrailo's.  Before hanging up, he told Anguiano to call him later.

Later that afternoon, Anguiano called Valenciano at his house, but could not reach him and did not leave a message.

Zamora confirmed she worked with Valenciano and Gonzales at Sambrailo's Packaging for a few months. At about 11:18 a.m. on July 25, 2004, Valenciano called Zamora on her cell phone. She told Valenciano she was on her half-hour lunch break at work. He did not ask her for a ride and never said he was in trouble.

9.   Further investigation, autopsy and forensic evidence

Meredith Baker used to date Soto in high school. After graduating, she went to college and Soto went to "jail" so she did not see him for approximately three years. At 10:31 a.m. on July 25, 2004, she got a call from Soto. Soto hurriedly said, "Meredith, I really need you to come get me. Can you please come get me." Meredith refused saying she needed to get ready for work, but Soto pleaded with her, "Please, I need you to do me a favor. Please come get me." She was upset and struggled with her feelings for Soto, answering "I can't go through this again." She asked where he was and Soto said he was off Frederick Street. At a later date, Soto's sister Doreen came into Meredith's workplace and told her she did not need to testify. If Meredith did testify, Doreen said, it would be her fault if Soto went to jail. Meredith believed that Soto was affiliated with the Nortenos. She did not hear from him again.

Meredith's mother, Linda Baker, saw her daughter was upset because she wanted to help Soto but could not. She later checked the caller ID on Meredith's phone which showed the 10:31 a.m. phone call came from Gonzales's phone number. Linda contacted the police and Detective Bentley came to their house.

At 1:30 p.m. on the day of the shooting, Santa Cruz County Sheriff's Deputy Daniel Brierley was assigned to find the suspect vehicle, a 1999 green Honda Accord with license plate number 4BFR732. He went to every known Norteno gang house in Santa Cruz and started a grid search. At the 400 block on Owen Street, with Clinton as the nearest cross street, Brierley found the vehicle unoccupied next to a bamboo hedge. Other officers arrived to secure the scene and assist in collecting evidence. In the thick bamboo hedge, the officers found an expended red 16–gauge shotgun shell, a sawed-off double-barrel 16–gauge shotgun, and a revolver loaded with three .38–caliber bullets. When the vehicle was subsequently searched, officers found a glove and collected samples of what appeared to be blood and tissue from its interior.

On July 25, 2004, Lore James lived at the corner of Clinton and Owen Street in Santa Cruz. Between 9:30 and 10:30 a.m., she left the house and saw a green car across the street on Owen. She heard loud rustling noises in the bushes across the street. As she walked out to the sidewalk, she heard a car door close, and saw three young Hispanic men, between 18 to 25 years old, walk from the green car across the street toward her. They talked softly to each other, and one man turned and looked directly at James as he passed. She drove away, picked up her son and returned to find police securing the area.

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

James told Officer Northrup she had seen three Hispanic men in their early 20s, five feet 10 inches to six feet tall. One had a medium build, dark complexion and wore a red bandana and baggie jeans. Another had a medium build, wore a white tank or v-neck shirt, baggie jeans, a baseball cap and carried a white bag.

At approximately 7:52 p.m. on July 25, 2004, Katy O'Doyle, whose front door faces Clinton Street, found a black Raiders sweatshirt in her backyard. She turned the sweatshirt over to the police. A couple of days later, Timothy Filed, who lived at Darwin and Clinton Streets, found a red sweatshirt, a baseball cap, and a pair of gloves inside the green waste trash can on the side of his home.

A DNA analysis on the red sweatshirt revealed three contributors from a stain on the back of the neck area, near the tag. Escobar's DNA was definitely present, and Soto and Valenciano could not be excluded as contributors to the mixture. Gonzales was excluded as a contributor of the DNA found on the sweatshirt.

Several different samples from the baseball cap were taken for DNA analysis. The bill and outside of the cap contained only Escobar's DNA. The tag included a mixture of DNA, with Valenciano representing the major contributor with at least two minor contributors. Soto could not be excluded as a possible minor contributor to the DNA on the tag.

One of the two gloves from the trash can contained a mixture of DNA consistent with two donors, Escobar and Soto. Soto could not be excluded as a possible major contributor and Escobar was a possible minor contributor. The other glove contained only Escobar's DNA. The glove found in the Honda contained DNA from Escobar and Gonzales. Soto and Valenciano were excluded as possible contributors of DNA on the glove.

Samples from the black Raiders sweatshirt included DNA from Escobar and Gonzales, and Escobar's blood was also found on the sweatshirt. Soto and Valenciano were excluded as contributors to the DNA found on that garment.

Santa Cruz Police Detective Warren Barry, along with other officers, searched the neighborhood where the Honda and weapons were found, looking for witnesses or businesses which may have videotapes. He reviewed a security videotape from a gas station mini-mart at Frederick and Soquel, but did not see any unusual activity and returned it. A few days later, he saw a picture of Soto at a police briefing and recalled seeing a man on the videotape with the same tattoo on the back of his neck and short black hair. He mentioned this to Northrup, who went to the mini-mart and obtained the video. The video showed Soto purchasing a soda at the store on July 25, 2004, at about 11:18 a.m. Barry obtained phone records for the payphone outside the mini-mart, and those records showed three calls were made at about the time of the murder: one at 11:03 a.m. to Valenciano's mother; one to Jose Carranco, who lived with Valenciano's sister, at 11:13 a.m. and one to Zamora at 11:14 a.m.

United States District Court

For the Northern District of California

On July 30, 2004, Bentley went to Hernandez's workplace and showed her a still photo from the videotape to see if she could identify the person as Soto. When she looked at the photo, she cried and became hysterical, yet claimed she could not recognize the person in it since it was too blurry.

According to Dr. Richard Mason, forensic pathologist for the Santa Cruz County Coroner, Escobar was killed by a contact FN5 shotgun wound to the head.

> FN5. The barrel of the shotgun was in contact with Escobar's head when it was fired.

10. Jailhouse informant's testimony

Nonu Randy Aluni was in the Santa Cruz jail, awaiting sentencing for a bank robbery, when he met Soto, Gonzales and Valenciano. Aluni, who was facing a sentence of 25 or 30 years for his role in the bank robbery, agreed to testify in this case in exchange for a sentence of between 10 and 13 years.

At separate times, Aluni was housed with Valenciano and Soto. Soto told Aluni he was a member of VGV and he discussed the shooting. Soto said the night before the shooting he and Gonzales planned to rob a liquor store in Santa Cruz, and he and Gonzales drove to Santa Cruz that morning in Hernandez's car. They first went to Valenciano's house and picked up the guns. When they got to the liquor store, there were too many people there, so they drove around the block and saw some guys playing poker. They drove around the block again and pulled over by the poker players. Valenciano stayed back at the car to listen to the police scanner. Gonzales and Soto walked up to the men and said, "Give me your money." One guy disrespected Gonzales so he shot him. As they were walking away, Soto yelled out another gang name, "Northside," to throw them off.

They got back in the car, drove down the block, hid the guns, threw the clothes away and started running towards the creek. Valenciano threw the police scanner, its batteries and the car keys in different directions. Soto went with Gonzales to call Hernandez, and he told her to report the car stolen. They caught up with Valenciano who was calling for a ride from a payphone at a church. The three got a ride to Hollister.

Soto showed Aluni a picture of himself taken by a gas station surveillance camera and asked if he could see blood on Soto's shirt. Soto claimed they committed the robbery because they needed the money. He also said his father owned a mechanics shop and someone there could provide him with an alibi.

At some point, Soto found out that Aluni was talking to the district attorney, and he threatened to kill Aluni's family if he testified. Soto had Aluni write a letter saying he made the whole thing up, and that he had obtained information about the case by reading Soto's paperwork when Soto was not in the cell. Aluni wrote a letter to his own attorney, Charlie Stevens, and another to Soto's attorney. In his letter

United States District Court

For the Northern District of California

to Stevens, Aluni lightly wrote in pencil that he was being threatened. Aluni also told Stevens he had been threatened by Soto.

About a month before he was housed with Soto, Aluni was housed with Valenciano who also told him about the shooting several times. Valenciano's version was consistent with Soto's, but he added the detail that the guns used belonged to their gang, VGV. Soto had the revolver and Gonzales had the shotgun, which they hid in some bushes after the robbery/shooting. They also hid some of their clothing in a garbage bin, before running to a lake or creek where they discarded the police scanner and car keys.

Aluni met Gonzales once, for 10 or 15 minutes, while in a holding cell going into court. He told Gonzales he already knew why Gonzales was in jail, and Gonzales described the robbery and shooting in much the same way as Soto and Valenciano. Gonzales also admitted killing Escobar.

*Soto*, at *6-*11. Evidence of gang activities and the defendants' gang membership also was presented at trial. *Id.* at *11-*14.

Soto testified at trial. He admitted to being a Northern Hispanic and being a member of the VGV gang in Watsonville, but denied paying gang taxes, denied having obligations toward fellow gang members and denied having enemies among rival Sureno gangs. *Id.* at *14. He admitted to being in Santa Cruz on the morning of the shooting but said he was there to look for a girl at the Santa Cruz Bible Church, but didn't find her.

The night before, he stayed at Martinez's house with his friend, Hernandez. Hernandez often gave him rides in her green Honda. Gonzales asked him if he could borrow Hernandez's car the next day, but did not say why he needed it.

The morning of July 25, Soto asked Hernandez for the keys to her car, saying he wanted to go to church. She offered to give him a ride, but he did not want her to know he was going to try to find a girl, so he declined her offer. Eventually, she gave him the keys without much of an argument.

He woke up Gonzales and they drove off. Gonzales drove and the plan was to drop Soto off at the church, while Gonzales used the car. They stopped at Valenciano's house to pick up Soto's cell phone and Valenciano agreed to give Soto a ride back from Santa Cruz about 11:00 a.m. Gonzales and Soto drove to Santa Cruz and Soto got out by the church. Gonzales drove away.

He wandered around the church area for about 20 minutes, but could not find the girl. A stranger approached him and they had a brief conversation, but Soto could not recall what they talked about or what the man looked like.

**United States District Court**

For the Northern District of California

Gonzales suddenly came up to Soto on foot and asked if he could give him a ride "like right now." Soto had not told Gonzales where he would be in the church complex and the bench on which he was sitting was not visible from the street, but somehow Gonzales found him. Soto called an ex-girlfriend, Baker, whom he had not seen in four years, but she could not pick them up.

Gonzales gave Soto his phone, telling him to call Hernandez and tell her to report her car was stolen. At about that time, Soto saw a green Honda driving down the street with people in the front and back, and Soto realized that Gonzales needed to get rid of the car. He did not ask questions because he did not want to be involved. Soto called Hernandez and told her to report the car had been stolen. She did not want to do so, but he repeated she should "fucking report it."

He and Gonzales walked up the street to the gas station where Valenciano was supposed to pick him up. He stopped in the station's store to buy a drink, and heard a man say in broken English that he had just seen his friend shot.

Valenciano picked them up, dropped Gonzales off and took Soto back to his (Valenciano's) house. Soto watched some television, then walked to the Green Valley Apartments. The numerous calls he made during this period to Julio Cabrera, Oscar Cabrera, Gonzales, Valenciano and Hernandez were simply him trying to find a ride. He eventually met up with Oscar and spent the night at the Cabrera residence. He did not see Martinez at the Cabrera house.

From that day to the date of his arrest, he never asked Gonzales about the car or what Gonzales was doing that morning, even after Hernandez told him about the shooting. He did not want to be involved or go back to prison. He repeatedly said he never asked Hernandez whether she gave his name to police, though on cross-examination he admitted he might have told her not to mention his name.

While incarcerated, Soto often talked to Aluni about his case, discussing how Martinez's statements were inconsistent, among other things. Soto also had "stacks of discovery" papers in his cell and Aluni was sometimes alone in Soto's cell FN10 when Soto would get a visit from his lawyer or family.

> FN10. Soto admitted Aluni was not one of his cellmates.

Aluni gave Soto a letter at some point, saying "Give this to your attorney" and Soto did so, without looking at the letter. After that, Soto's attorney told Soto to be careful around Aluni. When asked how he knew the contents of that letter, since it was not part of the discovery, Soto said a different letter from Aluni to a deputy district attorney, which was part of the discovery, mentioned that Aluni had written a similar letter to Soto's attorney. Soto never threatened Aluni at any time, but Aluni was lying in exchange for a reduced sentence.

United States District Court

For the Northern District of California

1    *Soto*, at \*14-\*15.

2    B.     <u>Procedural History</u>

3    A jury trial was held for Mr. Soto and Mr. Valenciano in Santa Cruz County Superior Court

4    in 2009.[2] Following the jury trial, Mr. Soto was convicted of conspiracy to commit robbery, first

5    degree murder, five counts of robbery, and two counts of attempted second degree robbery.

6    Sentence enhancement allegations that the crimes were for the benefit of a criminal street gang and

7    for personal use and discharge of a firearm were found true.  Mr. Soto was sentenced to a total of 84

8    years to life in prison.

9    Mr. Soto appealed.  The California Court of Appeal affirmed the judgment of conviction.

10   *See* Resp. Exs. 3 and 4. The California Supreme Court denied Mr. Soto's petition for review.

11   *See* Resp. Ex. 6.

12   Mr. Soto then filed this action.  His petition contends that the admission of an out-of-court

13   hearsay statement violated his federal constitutional rights to confrontation and due process.

14                                    **III.     <u>JURISDICTION AND VENUE</u>**

15   This Court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C.

16   § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the

17   conviction and sentence of a person convicted in Santa Cruz County, California, which is within this

18   judicial district.  28 U.S.C. §§ 84, 2241(d).

19                                    **IV.     <u>STANDARD OF REVIEW</u>**

20   This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

21   custody pursuant to the judgment of a State court only on the ground that he is in custody in

22   violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

23   The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to

24   impose new restrictions on federal habeas review.  A petition may not be granted with respect to any

25   claim that was adjudicated on the merits in state court unless the state court's adjudication of the

26

27   _____

     [2] Messrs. Soto, Valenciano and Gonzales were originally charged together.  In November
28   2005, the trial court granted the motion to sever the trial of Messrs. Soto and Valenciano from that
     of Mr. Gonzales.  *Soto*, at \*1 & n.1.

United States District Court

For the Northern District of California

1  claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

2  clearly established Federal law, as determined by the Supreme Court of the United States; or

3  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the

4  evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

5       "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

6  arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the

7  state court decides a case differently than [the] Court has on a set of materially indistinguishable

8  facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

9       "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

10  state court identifies the correct governing legal principle from [the Supreme] Court's decisions but

11  unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal

12  habeas court may not issue the writ simply because that court concludes in its independent judgment

13  that the relevant state-court decision applied clearly established federal law erroneously or

14  incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  "A federal habeas

15  court making the 'unreasonable application' inquiry should ask whether the state court's application

16  of clearly established federal law was 'objectively unreasonable.'"  *Id.* at 409.

17  ## V.  <u>DISCUSSION</u>

18  A.  <u>Confrontation Clause Claim</u>

19       A little more than a decade ago, the Supreme Court's decision in *Crawford v. Washington*,

20  541 U.S. 36 (2004), dramatically changed Confrontation Clause jurisprudence, and abandoned the

21  analytic framework from *Ohio v. Roberts*, 448 U.S. 56 (1980), that had been used for many years.

22  Mr. Soto's habeas petition contends that *Crawford* left the *Roberts* test intact for a subset of cases in

23  which the evidence at issue was nontestimonial hearsay and that, applying the *Roberts* test, a

24  Confrontation Clause violation occurred when certain nontestimonial hearsay was admitted at his

25  trial.  His argument fails because the Supreme Court and lower courts have determined that

26  *Crawford* did not leave the *Roberts* test intact; instead, the rule now is that the Confrontation Clause

27  simply does not apply to nontestimonial evidence.  The California Court of Appeal erred in its

28  analysis by applying the outdated *Roberts* test to deny Mr. Soto's claim.  Nonetheless, because no

Confrontation Clause violation occurred, Mr. Soto is not entitled to federal habeas relief.  The analysis is explained in more detail below.

1.   <u>California Court of Appeal Decision</u>[3]

The California Court of Appeal rejected Mr. Soto's Confrontation Clause claim in an analysis that was somewhat confusing and ultimately applied the wrong legal standard to the federal constitutional claim.

> [1][4]  Valenciano and Soto argue the trial court should have sustained their hearsay objections to the statements Gonzales made to Martinez, his girlfriend and mother of his child.  The court found the statements were nontestimonial and admissible under the declaration against interest rule.  The one false part of Gonzales' statement, i.e., where he denied being the shooter, did not make the remaining statements unreliable, but instead was Gonzales' attempt to tell Martinez what happened without admitting that he was, in fact, a murderer.  Soto and Valenciano concede that the statements were nontestimonial and limit their challenge to their admission under the declaration against interest exception.

> [2]   A criminal defendant has the right under both the federal and state Constitutions to confront the witnesses against him.  (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.)  In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the United States Supreme Court held that, under the confrontation clause, "[t]estimonial statements of witnesses absent from trial" are admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine [the witness]."  (*Id.* at p. 59, fn. omitted.)  "Under *Crawford*, . . . the Confrontation Clause has no application to [out-of-court, nontestimonial statements not subject to prior cross-examination] and therefore permits their admission even if they lack indicia of reliability."  (*Whorton v. Bockting* (2007) 549 U.S. 406, 420; *see also Davis v. Washington* (2006) 547 U.S. 813, 821.)  "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . ."  (*Crawford, supra*, at p. 68.)

---

[3] When there is a reasoned decision by the intermediate court, followed by a summary denial of the petition for review by the California Supreme Court, this Court will look through summary denials to the last reasoned decision and apply § 2254(d) to that decision.  *See Cannedy v. Adams*, 706 F.3d 1148, 1159 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).  Here, the California Court of Appeal's rejection of the Confrontation Clause claim was a reasoned decision, and was followed by a summary denial of the petition for review in the California Supreme Court.  Thus, the California Court of Appeal's reasoned decision is the one to which § 2254(d) is applied for the Confrontation Clause claim.

[4] This Court has added the bracketed numbers at the beginning of each of the paragraphs of the California Court of Appeal's analysis because this Court's analysis will refer to the particular paragraphs in that court's discussion.

United States District Court
For the Northern District of California

[3]   The veracity of nontestimonial hearsay statements is sufficiently dependable to allow the untested admission of such statements against a defendant when (1) the evidence falls within a firmly rooted hearsay exception or (2) the evidence contains "particularized guarantees of trustworthiness" such that adversarial testing would be expected to add little, if anything, to the statements' reliability. (*Ohio v. Roberts* (1980) 448 U.S. 56, 66; *Crawford*, *supra*, 541 U.S. at p. 68.) In *Lilly v. Virginia* (1999) 527 U.S. 116 (*Lilly*), a plurality of the court held that "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." (*Id*. at p. 134, fn. omitted.)  "This, of course, does not mean, . . . that the Confrontation Clause imposes a "blanket ban on the government's use of [nontestifying] accomplice statements that incriminate a defendant."  Rather it simply means that the government must satisfy the second prong of the *Ohio v. Roberts*, 448 U.S. 56 (1980) test[, that the statements bear a particularized guarantee of trustworthiness,] in order to introduce such statements." (*Id*. at p. 134, fn. 5.)  On appeal, we conduct a de novo review to determine whether that trustworthiness test has been satisfied.  (*Id*. at ¶. 136-137.)

[4]   "In California, '[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, ... so far subjected him to the risk of ... criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true.' ( [Evid.Code,] § 1230.)  The proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*People v. Duarte* (2000) 24 Cal.4th 603, 610–611.)  "'To determine whether [a particular] declaration [against penal interest] passes [Evidence Code] [section 1230's] required threshold of trustworthiness, a trial court "may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant."'  [Citation.]  We have recognized that, in this context, assessing trustworthiness '"requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception."'" (*Id*. at p. 614.)

[5]   "There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against [penal] interest exception. The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 334 (*Greenberger*).)  "When examining what was actually said by the declarant special attention must be paid to any statements that tend to inculpate the nondeclarant.  This is so because a statement's content is most reliable in that portion which inculpates the declarant.  It is least reliable in that portion which shifts

United States District Court

For the Northern District of California

responsibility. Controversy necessarily arises when the declarant makes statements which are self-inculpatory as well as inculpatory of another.  This is why Evidence Code section 1230 only permits an exception to the hearsay rule for statements that are specially disserving of the declarant's penal interest.  [Citation.]  This is not to say that a statement that incriminates the declarant and also inculpates the nondeclarant cannot be specifically disserving of the declarant's penal interest.  Such a determination necessarily depends upon a careful analysis of what was said and the totality of the circumstances."  (*Id.* at p. 335.)

[6]   The Court of Appeal in *Greenberger* considered out-of-court statements made by some defendants implicating other defendants. The court held that "a defendant's declarations against [penal] interest may be received in a joint trial without denying the codefendant the right of confrontation guaranteed by the United States Constitution." (*Greenberger*, *supra*, 58 Cal.App.4th at p. 314.)  "Since declarations against [penal] interest may be admitted in evidence without doing violence to the confrontation clause, we see no reason why such declarations, when made by a codefendant, should not also be admissible." (*Id.* at p. 332.)

[7]   In *People v. Cervantes* (2004) 118 Cal.App.4th 162 (*Cervantes*), a nontestifying codefendant, Morales, inculpated himself and his two codefendants, Cervantes and Martinez, in a murder and an attempted murder while speaking to a friend of all three defendants, Ojeda. (*Id.* at ¶. 166–167.)  On appeal the two codefendants contended that Morales' statement to the friend should have been excluded.  (*Id.* at p. 169.) The appellate court found that the trial court did not err in admitting evidence of the statement at the defendants' joint trial. Following *Greenberger*, the court found that the statement qualified as a declaration against penal interest and satisfied the constitutional standard of trustworthiness. (*Id.* at p. 177.)  "The evidence here showed Morales made the statement within 24 hours of the shooting to a lifelong friend from whom he sought medical treatment for injuries sustained in the commission of the offenses....  Regarding the content of the statement, Morales did not attribute blame to Cervantes and Martinez but accepted for himself an active role in the crimes and described how he had directed the activities of Martinez." (*Id.* at p. 175.)  "Ojeda consistently reported that Morales admitted shooting at the second male with Cervantes. The statement Cervantes shot the first male, as well as the statement Morales shot at the second male, both incriminated Morales because Morales was acting in concert with Cervantes at all relevant times. Thus, the discrepancies in the statement as repeated by Ojeda does not preclude a finding the statement was trustworthy." (*Id.* at p. 176.)  "Regarding the claim the statement should have been redacted to exclude reference to the nondeclarants, *Greenberger* specifically held this is not required where the statement admitted into evidence is disserving to the interests of the declarant.  We agree with Greenberger 's analysis on this point." (*Ibid.*)

[8]   Here, the statements by Gonzales implicated him, as well as Soto and Valenciano, in the robbery and murder.  Gonzales described to Martinez how the robbery and murder were committed, who was

United States District Court

For the Northern District of California

involved in it, and in what manner, and thereby admitted that he was acting in concert with Soto and Valenciano at all relevant times. The statements were not made to the police during questioning and Gonzales' only effort to mitigate his own conduct or shift the blame was to consistently deny pulling the trigger. At the time Gonzales made the statements, his only motive to lie was to keep Martinez, the mother of his child, from knowing he had blown someone's head open with a shotgun. "[T]he most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures." (*Greenberger, supra*, 58 Cal.App.4th at p. 335; *Cervantes, supra*, 118 Cal.App.4th at p. 175.) After independently reviewing the record, we find that the statements Gonzales made to Martinez bore a particularized guarantee of trustworthiness. Accordingly, admission of the statements did not violate the federal or state Constitutions or state law. (*Lilly, supra*, 527 U.S. at ¶. 136-137; *Ohio v. Roberts, supra*, 448 U.S. at p. 66; *Cervantes, supra*, 118 Cal.App.4th at p. 177.)

*Soto*, at *16-*18.

2.     The Confrontation Clause - *Crawford* Works A Major Change

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him." U.S. Const. amend. VI. The ultimate goal of the Confrontation Clause "is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford*, 541 U.S. at 61.

The Confrontation Clause applies to all "testimonial" statements. *See Crawford*, 541 U.S. at 50-51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51 (internal quotation marks and brackets omitted); *see id.* at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."); *id.* at 68 ("[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations"). In *Davis v. Washington*, 547 U.S. 813 (2006), the Supreme Court distinguished testimonial and nontestimonial statements to police. "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that

**United States District Court**
For the Northern District of California

1    there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish

2    or prove past events potentially relevant to later criminal prosecution." *Id*. at 822; *see, e.g., id.* at

3    826-28 (victim's frantic statements to a 911 operator naming her assailant who had just hurt her

4    were not testimonial); *id.* at 829-30 (victim's statements to officer telling him what had happened

5    were testimonial, as there was no emergency in progress and were made after police officer had

6    separated victim and assailant); *Crawford*, 541 U.S. at 39-40, 68 (statements were testimonial where

7    made by witness at police station to a series of questions posed by an officer who had given

8    *Miranda* warnings to witness and was taping and making notes of the answers).

9       Before *Crawford* was decided, the Confrontation Clause analysis had been governed by the

10    "indicia of reliability" test set out in *Ohio v. Roberts*, 448 U.S. 56, 65-66 (1980). Under the

11    *Roberts* test, hearsay statements could be introduced only if the witness was unavailable at trial and

12    the statements had "adequate indicia of reliability," i.e., the statements fell within a "firmly rooted

13    hearsay exception" or bore "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66.

14    *Roberts* was overruled in *Crawford*, although some readers of the *Crawford* opinion believed that

15    *Roberts* was not overruled as to nontestimonial statements. Two years later, the Supreme Court

16    clarified in *Davis v. Washington*, 547 U.S. 813, 821 (2006), that the *Roberts* test had *no* continuing

17    validity. Nontestimonial hearsay, "while subject to traditional limitations upon hearsay evidence, is

18    not subject to the Confrontation Clause." *Davis*, 547 U.S. at 821. The Supreme Court made the

19    same point again the following term, when it referred to "*Crawford's* elimination of Confrontation

20    Clause protection against the admission of unreliable out-of-court nontestimonial statements."

21    *Whorton v. Bockting*, 549 U.S. 406, 420 (2007).

22       In an en banc decision, the Ninth Circuit has recognized that the *Roberts* test no longer

23    survives, and that nontestimonial statements are now outside the scope of the protection of the

24    Confrontation Clause. *See United States v. Larson*, 495 F.3d 1094, 1099 n.4 (9th Cir. 2007) (en

25    banc). The court explained that earlier it was unresolved whether the *Roberts* test "to determine the

26    admissibility of out-of-court nontestimonial statements survived *Crawford*," but the Supreme Court

27    then clarified in *Bockting*, 549 U.S. 406, "that *Crawford* 'eliminat[es] Confrontation Clause

28    protection against the admission of unreliable out-of-court non-testimonial statements' and that 'the

**United States District Court**
For the Northern District of California

1   Confrontation Clause has no application to such statements and therefore permits their admission

2   even if they lack indicia of reliability.'" *Larson*, 495 F.3d at 1099 n.4; *see also Delgadillo v.*

3   *Woodford*, 527 F.3d 919, 924 (9th Cir. 2008) ("*Crawford* rejected [the *Roberts*] framework for

4   analyzing Confrontation Clause violations," and nontestimonial statements no longer raise

5   Confrontation Clause concerns).

6          Other circuits also have concluded that the Confrontation Clause no longer applies to

7   nontestimonial hearsay statements, although they have not all agreed on whether it was *Crawford*,

8   *Davis* or *Bockting* that sounded the death knell.  *See United States v. Castro-Davis*, 612 F.3d 53, 64

9   n.14 (1st Cir. 2010) ("until *Davis*, *Roberts* remained the controlling precedent for judging whether

10  non-testimonial hearsay violated the Confrontation Clause. After *Davis*, however, non-testimonial

11  hearsay no longer implicates the Confrontation Clause at all"); *United States v. Smalls*, 605 F.3d

12  765, 774 (10th Cir. 2010) (*Davis* "squarely confronted the issue of whether the Confrontation Clause

13  had any application to nontestimonial hearsay statements, or, in other words, whether any portion of

14  *Roberts* remained good law.  In *Davis*, the Court placed the question of the admissibility of

15  nontestimonial hearsay statements entirely outside the confines of the Confrontation Clause and

16  rendered *Roberts* academic"); *United States v. Johnson*, 581 F.3d 320, 325 (6th Cir. 2009) (although

17  it had been an open question whether nontestimonial statements continued to be governed by the

18  *Roberts* test after *Crawford*, the Supreme Court's later decisions in *Davis* and *Bockting* answered the

19  question in the negative).

20          3.      Analysis of Federal Habeas Claim

21          The California Court of Appeal's analysis of Mr. Soto's Confrontation Clause claim

22  confusingly articulated the correct legal standard in one paragraph, but then applied the incorrect

23  legal standard in later paragraphs.  The first paragraph of the analysis framed the issue.  The state

24  appellate court first noted that the trial court had found that the statements were nontestimonial and

25  admissible under the declaration against interest exception to the hearsay rule.  The state appellate

26  court then noted that the defendants had conceded that the statements were nontestimonial and had

27  limited their challenge to the trial court's ruling that the statements were admissible under the

28  hearsay exception for declarations against interest.  *See* Cal. Evid. Code § 1230.  In the second

United States District Court

For the Northern District of California

paragraph, the state appellate court identified the correct legal rule, i.e., that the Confrontation Clause has no application to nontestimonial hearsay following *Crawford*, *Davis* and *Bockting*. The problem arises in the third paragraph of the discussion because there the California Appellate Court cited and revived the *Roberts* test, indicating that the *Roberts* test was the test for determining whether the admission of the nontestimonial hearsay statements could be admitted without offending the Confrontation Clause. The next five paragraphs of the analysis considered California law on hearsay to determine whether the hearsay statements "bore a particularized guarantee of trustworthiness." *Soto*, at *18. The final two sentences and citations in the eighth paragraph show that the California Court of Appeal applied *Roberts* to determine that no Confrontation Clause violation had occurred. First, the California Court of Appeal stated that it had "independently review[ed] the record," – a requirement from the outdated analysis in *Lilly*[5] that had been mentioned in the troublesome third paragraph of the California Court of Appeal's decision. Second, the California Court of Appeal found "that the statements Gonzales made to Martinez bore a particularized guarantee of trustworthiness" – a phrase that is part of the *Roberts* test. And third, the California Court of Appeal cited *Lilly* and *Roberts*, but not *Crawford*, *Davis* or *Bockting*, as support for its conclusion that the "admission of the statements did not violate the federal or state Constitutions or state law." *Soto*, at *18.

A state court's "mistakes in reasoning or in predicate decisions" such as using the wrong legal rule or framework "constitute error under the 'contrary to' prong of § 2254(d)(1)." *Frantz v. Hazey*, 533 F.3d 724, 734 (9th Cir. 2008) (en banc) (state court's review of claim for interference with right to self-representation for harmlessness was contrary to clearly established Supreme Court precedent holding that it was structural error). In such a case, habeas relief is not automatically granted; rather, the federal court must do a de novo review of the constitutional issue raised. *Id.* at 735 (citing *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007)). In deciding whether there is a § 2254(d)(1) error, the federal court's analysis is confined to the state court's actual decisions and

---

[5] *Lilly* applied the *Roberts* test to a nontestifying accomplice's confession made to the police during a custodial interrogation by the police, i.e., testimonial hearsay. *See Lilly*, 527 U.S. at 120-21.

United States District Court

For the Northern District of California

1   analysis, but in doing the de novo review once such an error is found, the federal court is not limited

2   to the reasoning of the state court. *Id.* at 737-39; *see, e.g., Moore v. Biter*, 725 F.3d 1184, 1193 (9th

3   Cir. 2013) (after finding state court decision "contrary to" federal law because it failed to apply the

4   correct federal rule for sentencing of juvenile offenders, Ninth Circuit conducted de novo review of

5   issue and found error).

6        Here, by applying the *Roberts* test, the California Court of Appeal used the wrong legal

7   framework to evaluate Mr. Soto's Confrontation Clause claim.  The Supreme Court's *Crawford*,

8   *Davis* and *Bockting* decisions had clearly established that the *Roberts* test no longer applied and that

9   nontestimonial hearsay evidence was not covered by the Confrontation Clause.   The California

10  Court of Appeal's use of the wrong rule (i.e., the *Roberts* test) "constitute[d] error under the

11  'contrary to' prong of § 2254(d)(1)."  *Frantz*, 533 F.3d at 734.  That does not mean that Mr. Soto

12  obtains habeas relief as a bonus for the state court's error; instead, it means that this Court must do a

13  de novo review of the Confrontation Clause claim.  *See id.*

14       A de novo review is a simple matter here because there is a bright line rule: the

15  Confrontation Clause does not apply to nontestimonial hearsay.  *See Bockting*, 549 U.S. at 420;

16  *Davis*, 547 U.S. at 821; *Crawford*, 541 U.S. at 50-51; *Larson*, 495 F.3d at 1099 n.4; *Delgadillo*, 527

17  F.3d at 924.  Mr. Soto conceded in state court that the statements were nontestimonial, as he

18  identified them as "nontestimonial statements," and the thrust of his argument in his petition for

19  review was that *Crawford* did not apply because the *Roberts* test remained intact for nontestimonial

20  statements such as Mr. Gonzales' statements to Ms. Martinez.  Resp. Ex. 5 (Petition for Review, p.

21  5; *see also id.* at 10 ("Gonzalez's statements to Vanessa [Martinez] do not appear to be testimonial

22  within the meaning of *Crawford* or *Davis*").  Mr. Soto does not contend that the statements of Mr.

23  Gonzales to Ms. Martinez were testimonial, nor would such an argument be well-founded because

24  their boyfriend-to-girlfriend communications were just the sort of communications that courts have

25  repeatedly held to be nontestimonial and therefore outside the protection of the Confrontation

26  Clause.  *See, e.g., Desai v. Booker*, 732 F.3d 628, 630 (6th Cir. 2013) ("the Confrontation Clause no

27  longer applied to nontestimonial hearsay such as the friend-to-friend confession"); *United States v.*

28  *DeLeon*, 678 F.3d 317, 321-24 (4th Cir. 2012), *judgment vacated on other grounds*, 133 S. Ct. 2850

United States District Court

For the Northern District of California

1  (2013) (admission of evidence of stepson's statements describing his defendant-stepfather's

2  disciplinary methods to social worker made several months before the stepson died did not implicate

3  the Confrontation Clause because they were made for purposes of formulating a family treatment

4  plan and were not testimonial); *United States v. Berrios*, 676 F.3d 118, 127-28 (3d Cir. 2012)

5  (admission of evidence of surreptitiously recorded jailhouse conversations between codefendants did

6  not violate the Confrontation Clause because they were not testimonial).

7       Mr. Soto argues that the *Roberts* test applies to his case, notwithstanding the decision in

8  *Crawford*.  He argues that "it is [an] *open question* as to whether the admission of non-testimonial

9  statements violate the Confrontation Clause under the traditional test of reliability announced in"

10 *Roberts.*  Resp. Ex. 5, Petition for Review, p. 10.   This argument fails because, as explained in

11 Section "2" above, the Supreme Court and the Ninth Circuit have firmly said that the *Roberts* test no

12 longer applies and that the Confrontation Clause does not apply to nontestimonial hearsay.

13      Mr. Soto also argues that the fact that *Crawford* did not overrule *Lilly v. Virginia*, 527 U.S.

14 116 (1999), supports his argument that the *Roberts* test survives because *Lilly* had applied the

15 *Roberts* test for reliability and trustworthiness.  *See* Resp. Ex. 5, Petition for Review, p. 11; *see*

16 *also* Docket # 1 at 26-30 (legal argument in his federal habeas petition consists almost entirely of a

17 lengthy quote from *Lilly*).  Mr. Soto's reliance on *Lilly* does not help him because the evidence at

18 issue in *Lilly* was a confession made during police interrogation, *see Lilly*, 527 U.S. at 120-21, and

19 therefore was testimonial hearsay of just the sort that *Crawford* determined was covered by the

20 Confrontation Clause.  *Crawford* recognized that very point in its reference to *Lilly*, as *Crawford*

21 noted that even where its recent cases (including *Lilly*) had followed the reasoning of *Roberts*, those

22 cases made a distinction for testimonial hearsay, and testimonial hearsay required unavailability and

23 prior cross-examination.  *See Crawford*, 541 U.S. at 58 (*Lilly* "excluded testimonial statements that

24 the defendant had had no opportunity to test by cross-examination"); *see also Davis*, 547 U.S. at

25 825.  Thus, the fact that the Supreme Court did not overrule *Lilly* (which concerned testimonial

26 hearsay) does not provide any support for the argument that the *Roberts* test survives or that the

27 Confrontation Clause continues to apply to nontestimonial hearsay.  Mr. Soto sees his case and

28 *Lilly* as similar because both involved confessions by accomplices, but the critical difference in this

United States District Court

For the Northern District of California

1   post-*Crawford* time is that the confession in Mr. Soto's case was to a girlfriend (and nontestimonial)

2   whereas the *Lilly* confession was during police interrogation (and, therefore, testimonial). *See*

3   *generally United States v. Smalls*, 605 F.3d 765, 773 (10th Cir. 2010) (district court erred in

4   applying *Roberts* test to accomplice's statement to confidential informant because it was

5   nontestimonial; "*Roberts* was no longer good law when the district court made its decision in this

6   case, rendering *Lilly* a dead letter and eviscerating not only the presumption of unreliability, but the

7   entire foundation upon which the district court's order rested").

8          The admission of the nontestimonial hearsay statements from Mr. Gonzales to Ms. Martinez

9   did not implicate, let alone violate, Mr. Soto's Confrontation Clause rights. He is not entitled to

10  habeas relief on this claim.

11   B.    Due Process Claim

12         Mr. Soto also argues that the admission of Mr. Gonzales' statements to Ms. Martinez

13  violated his right to due process because the evidence was unreliable hearsay. *See* Docket # 1 at 8.

14         Neither the California Court of Appeal nor the California Supreme Court discussed Mr.

15  Soto's due process claim. "When a federal claim has been presented to a state court and the state

16  court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in

17  the absence of any indication or state-law procedural principles to the contrary." *Harrington v.*

18  *Richter*, 562 U.S. 86, 99 (2011) (one-sentence order denying habeas petition analyzed under

19  §2254(d)); *see also Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013) (order discussing state law

20  claim but not federal claim rebuttably presumed to be rejection on the merits and therefore subject to

21  § 2254(d)). Mr. Soto does not dispute that the state supreme court decided his claim on the merits.

22         The summary rejection of the due process claim by the California Supreme Court was neither

23  contrary to nor an unreasonable application of clearly established United States Supreme Court

24  authority. In addition, the state court's decision was not based on an unreasonable determination of

25  the facts.

26         The Supreme Court has repeatedly held that federal habeas writ is unavailable for violations

27  of state law or for alleged error in the interpretation or application of state law. *See Swarthout v.*

28  *Cooke*, 562 U.S. 216, 220 (2011). Thus, to the extent Mr. Soto is urging that the California

1   Evidence Code's hearsay rule was misapplied in state court, it would be a claim for a state law error

2   for which federal habeas relief is not available.

3        A state court's evidentiary ruling is not subject to federal habeas review unless the ruling

4   violates federal law, either by infringing upon a specific federal constitutional or statutory provision

5   or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *See Pulley*

6   *v. Harris*, 465 U.S. 37, 41 (1984).  The Supreme Court "has not yet made a clear ruling that

7   admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient

8   to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009)

9   (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair"

10  under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly

11  established Federal law under § 2254(d)).  Absent violation of a specific constitutional or statutory

12  provision, the due process inquiry in federal habeas review is whether the admission of evidence

13  was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass*, 45

14  F.3d 1355, 1357 (9th Cir. 1995).  Here, the admission of  Mr. Gonzales' statement to Ms. Martinez

15  which implicated himself along with Mr. Soto did not render the trial fundamentally unfair.  Mr.

16  Soto fails to demonstrate that admission of the statement violated state evidentiary rules; as the

17  Court of Appeal noted, statement was admissible hearsay under Evid. Code § 1230 as a declaration

18  against the declarant's personal interest which was imbued with reliability and trustworthiness.

19  Given the state court's finding that the statement was sufficiently trustworthy so as to satisfy state

20  evidentiary rules, admission of Gonzales' statement was not so arbitrary or prejudicial as to render

21  the Mr. Soto's trial fundamentally unfair.  Furthermore, even if admission of the statement violated

22  state evidence rules and was so arbitrary as to violate due process, Petitioner is not entitled to habeas

23  relief unless the evidence had a "'substantial and injurious effect on the verdict.'" *Dillard v. Roe*,

24  244 F.3d 758, 767 n.7 (9th Cir. 2001) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

25  Given the strength of the evidence against Mr. Soto, no such effect can be found in the instant case.

26       Moreover, the Ninth Circuit has held (albeit in a different context) that, where a habeas

27  petitioner challenges his conviction based on the allegedly erroneous admission of evidence, as long

28  as there is some permissible inference that may be drawn, the introduction of such evidence does not

23

violate due process. *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions. Only if there are *no* permissible inference they jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' [Citation] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." *Jammal*, 926 F.2d at 920 (footnote omitted). Here, there was a permissible inference that could be drawn from Gonzales' statement – that Soto was involved in the crime.

Accordingly, Mr. Soto is not entitled to relief on his due process claim.

C.      A Certificate Of Appealability Will Not Issue

Mr. Soto has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and this is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a certificate of appealability is **DENIED**.

## VI.    CONCLUSION

The petition for writ of habeas corpus is **DENIED** on the merits. The Clerk shall close the file.


IT IS SO ORDERED.


Dated: March 25, 2015

_____
EDWARD M. CHEN
United States District Judge